424 S.E.2d 579

**Brigitte WICKLINE, Plaintiff Below, Appellant,**

v.

**Michael HOUSE, Superintendent, Pruntytown Correctional Facility, Defendant Below, Appellee.**

No. 20856.

Supreme Court of Appeals
of West Virginia.

Submitted: Sept. 15, 1992.

Decided: Nov. 13, 1992.

William D. Levine, J. William St. Clair, St. Clair and Levine, Huntington, for appellant.

Mario Palumbo, Michael J. Basile, Office of the Atty. Gen., Charleston, for appellee.

PER CURIAM:

Brigitte Wickline was convicted of first degree murder without a recommendation of mercy by a Wayne County jury in February, 1989. Upon appeal to this Court, that conviction was affirmed. *State v. Wickline*, 184 W.Va. 12, 399 S.E.2d 42 (1990). Despite that affirmance, we addressed Ms. Wickline's assertion that she was denied effective assistance of counsel in violation of her constitutionally protected rights. Therein we stated:

We cannot tell from the record what reasons trial counsel had in failing to raise ... potential defenses and whether there is any rational support for his decision to present no witnesses. As we held in Syllabus Point 11 of *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988):

'Where the record on appeal is inadequate to resolve the merits of a claim of ineffective assistance of counsel, we will decline to reach the claim so as to permit the defendant to develop an adequate record in habeas corpus.'

*See also State v. Smith*, 181 W.Va. 700, 384 S.E.2d 145 (1989); *State v. Tesack*, 181 W.Va. 422, 383 S.E.2d 54 (1989).

184 W.Va. at 20, 399 S.E.2d at 50.

Subsequent to the affirmance of her conviction, Ms. Wickline sought post-conviction habeas corpus relief in the Circuit Court of Wayne County. After hearings were held wherein trial counsel for both the State and Ms. Wickline testified, the trial court found, among other things, that Ms. Wickline had received effective assistance of counsel, and declined to order a new trial. Upon Ms. Wickline's appeal from the trial court's denial of habeas corpus relief, we find that she did not receive effective assistance of counsel, and we therefore reverse

the March 12, 1991 order of the trial court and remand this case for a new trial.

The appellant was arrested on June 25, 1988 and charged with the murder of her husband. Although the appellant did not physically kill her husband, she initially told state police investigators that she had. A written statement signed by the appellant was taken to this effect. This statement was given at the crime scene in the early hours of the morning immediately following the murder, and was later ruled inadmissible at trial by the trial court because the appellant had been given inadequate *Miranda* [1] warnings.

Thereafter, the appellant was confined to a police cruiser for several hours. She requested that she be permitted to make another statement away from the crime scene, and, after being transported to the state police barracks in Wayne, she was permitted to do so. This later statement was also written and signed by the appellant. Therein, the appellant alleged that her husband had been both physically and verbally abusive to her, and that she had wanted to divorce him. She stated that she had conspired on several occasions with her neighbors, Mike and Doris Jean Moore, to have her husband killed. She admitted that nothing had resulted from any of the prior conspiracies, but that a plan to kill her husband had been instigated on the night of the murder. Although this initial murder plan was not carried out, the appellant confessed that she and Mr. and Mrs. Moore altered the plan, and, although she did not physically kill her husband, she gave the final order to Mr. Moore to kill him. [2]

Following her arrest and confession, the trial court appointed counsel to represent the appellant. Thomas Butcher, a Hunt-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The following exchange is documented in the appellant's last confession:

Q. At this time did you and Mike and [Mrs. Moore] decide to go through with the murder of John?

A. Yes, Mike was real mad at John. John had touched [Mrs. Moore] in places he shouldn't have, at least that was what [Mrs. Moore] had told Mike. Mike was real mad.

Mike at first said he was just going to go in and beat him up real bad.... [Mrs. Moore] went in to use the bathroom.

Q. How long was [Mrs. Moore] inside?

A. She was just in there a few minutes when she came back out and asked me if I wanted Mike to go ahead and cut his throat and I told her yes, to go ahead and finish it.

When the victim's body was found, he had almost been entirely decapitated.

ington lawyer, was appointed for this purpose. Mr. Butcher had practiced law for over fourteen years, and, at that time, ninety-five percent of his law practice was devoted to criminal defense work.

Prior to trial in this matter, Mr. Butcher sought an order from the trial court to allow the appellant to undergo psychiatric and psychological testing to determine her competence to stand trial. Based upon Mr. Butcher's representation to the trial court that the appellant had exhibited behavior suggesting a mental illness, the trial court ordered a twenty-day in-patient psychiatric evaluation on December 1, 1988. This order was amended on December 27, 1988 to instead require a two-day outpatient evaluation. The one-page psychiatric evaluation stated that the appellant was competent to stand trial, but diagnosed "borderline mental retardation." [3]

Prior to trial in this matter, Mr. Butcher pursued several possible defenses for the appellant. Because of information imparted by the appellant and her family, he considered using evidence of "battered wife syndrome." He also considered using a "diminished capacity" defense. However, he abandoned those potential defenses in favor of a "firebreak" theory after observing the trial of the appellant's co-defendant, Mr. Moore.

At Mr. Moore's trial, the State had proceeded primarily on a theory that Mr. Moore had murdered the victim because the victim had "fondled" Mrs. Moore. Therefore, Mr. Butcher concluded that, based upon the theory utilized by the State in Mr. Moore's trial (where Mr. Moore was convicted of first degree murder without a recommendation of mercy), there was a "firebreak" between any conspiracy to murder the victim and Mr. Moore's actual motive for the murder. [4]

By Mr. Butcher's reckoning, any evidence of "battered wife syndrome" would have harmed the "firebreak" defense and provided the appellant with a motive for murder. However, Mr. Butcher acknowledged that any evidence that the appellant suffered from "diminished capacity" would not have hurt his "firebreak" theory, and in fact he requested that the trial court take "judicial notice" of the appellant's lack of capacity prior to trial. Strangely, Mr. Butcher did not pursue this avenue of defense through the use of psychological or psychiatric evidence, apparently because of his own observations of the appellant and the fact that she had been found competent to stand trial. [5]

In preparing his "firebreak" defense for trial, Mr. Butcher was aware that the State's case relied heavily upon the last confession given by the appellant to police. [6]

---

**3.** Under the heading "mental status exam," the report stated:

> Patient is appropriately dressed and groomed and cooperative during the examination and maintains eye contact and has no unusual mannerisms during the examination. Sensorium is intact as to time, place, person and situation. Stream of thought is spontaneous and coherent. Thought content is devoid of delusions or hallucinations. Intellectual functioning is borderline with difficulty in interpreting proverbs abstractly, some difficulty in calculating serial sevens and digit span is limited to three.

**4.** The term "firebreak" derivates from the technique of fighting forest fires by control-burning a stretch of forest (the "firebreak") in the path of the out-of-control fire. When the out-of-control fire arrives at the "firebreak," it is prevented from spreading further because all the flammable material in its immediate path has been consumed. The fire then dies out. In this case, the prior conspiracy to murder the victim plays the role of the out-of-control fire, while the "fondling" of Mrs. Moore by the victim constitutes the "firebreak." Under this theory, a new motive, separate and apart from the conspiracy, is imparted to Mr. Moore, and the appellant is prevented and separated from any role in the murder.

**5.** At the habeas corpus proceeding, Mr. Butcher stated that he had discarded the "diminished capacity" defense "fairly early on" in his preparations for trial because "[t]he report that we had here was that Brigitte was competent [and other] reports ... referring to Brigitte's actions the night of the homicide, gave no indication whatsoever of diminished capacity. She knew what was going on."

**6.** At the habeas proceeding, Mr. Butcher answered the following question:

> Q. [W]hat did you anticipate the State's case against Brigitte to be?
> A. It centered, of course, around her confession.

It is clear that the appellant's confession presented at least a *prima facie* case of first degree murder.[7] Mr. Butcher attempted to suppress this confession at the trial. One of the reasons used by Mr. Butcher to support the suppression motion was that the appellant lacked the capacity to waive her right to avoid self-incrimination and her right to counsel. Again, Mr. Butcher did not attempt to prove this lack of capacity through psychiatric or psychological evidence, but rather, he sought to persuade the trial court to take judicial notice of the appellant's lack of capacity. The motion failed and the confession was heavily utilized by the State in its case against the appellant.[8]

Mr. Butcher did not change his "firebreak" strategy despite the admission of the appellant's confession. No evidence was presented on behalf of the appellant at the trial. The appellant was convicted of first degree murder. Mercy was not recommended.

At the habeas corpus proceeding, the appellant's mother testified that the appellant suffered from long-standing neurological problems, and that she had made Mr. Butcher aware of those problems. Also, a psychologist who had participated in the appellant's competency evaluation testified that the available evidence suggested that the appellant may have lacked the capacity to waive her rights prior to her confession. The following question was asked of the psychologist at the habeas corpus proceeding:

> Q. Based upon all the information you received from [the appellant] and all the other sources, does that information give you any indication as to whether [the appellant] could have knowingly and voluntarily waived her Miranda warnings?

> A. It suggests that there is a reasonable probability that she may not have been able to have comprehended the situation well enough to have knowingly waived.

As stated above, despite the dearth of evidence contradicting the appellant's confession, Mr. Butcher did not seek to attack the validity of the confession through the most obvious method—expert testimony confirming the appellant's diminished capacity.

In the habeas corpus proceedings before the trial court, the appellant asserted several grounds for relief. All were denied. Upon appeal of the denial of habeas relief to this Court, the appellant asserts only one ground for relief. She contends the trial court erred in failing to grant her a new trial because of ineffective assistance of counsel.

 In *Marano v. Holland* 179 W.Va. 156, 171–72, 366 S.E.2d 117, 132–33 (1988), we noted our traditional test to determine ineffective assistance of counsel:

> We have traditionally utilized Syllabus Points 19 and 21 of *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), as our test for ineffective assistance of counsel under article III, § 14 of the West Virginia Constitution [footnote omitted] as well as the Sixth Amendment to the United States Constitution:
>
> > '19. In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law,

---

7. The following exchange occurred between appellant's habeas counsel and Mr. Butcher:
 Q. Wouldn't you say this confession shows that she did ask Michael Moore to kill her husband and that it actually took place?
 A. As a yes or no answer, yes.

8. It appears that Mr. Butcher was well aware of the difficulties the suppression motion would face without expert testimony showing the appellant's lack of capacity. He was asked the following at the habeas proceeding:
 Q. [D]o you think the court could take judicial notice of Brigitte's mental retardation as it affects her ability to voluntarily waive her constitutional rights?
 A. It could. I don't believe we expected it would.

except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

\* \* \* \* \* \*

'21. Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.'

In *State v. Watson*, 164 W.Va. 642, 652, 264 S.E.2d 628, 634 (1980), we also emphasized that 'any charge of ineffectiveness of trial counsel must ultimately relate to a matter which would have affected the jury decision.' Our cases thus hold that a defendant who asserts a claim of ineffective assistance of counsel must prove (1) that his legal representation was inadequate, and (2) that such inadequacy prejudiced his case. Much the same standards are found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ In this case we are at a loss to understand trial counsel's failure to attack the appellant's confession through the use of expert psychiatric or psychological evidence. Although it is possible that such evidence may have shown that the appellant did not suffer from any lack of capacity, all the facts before trial counsel pointed to a contrary result. Through the appellant's family, he was aware of longstanding neurological problems. Through the competency examination, he was aware that the appellant was "borderline mentally retarded." Moreover, the psychologist who helped determine the appellant's competency to stand trial opined that, had the appellant been evaluated for diminished capacity, there was a reasonable probability that he would have found that the appellant did not knowingly waive her Miranda rights prior to the confession. Nonetheless, trial counsel neglected to even request the trial court to order an evaluation of her capacity to waive those rights.[9]

Based upon the foregoing, we find that the appellant was denied effective assistance of counsel in violation of article III, section 14 of the *West Virginia Constitution* and the Sixth Amendment to the *United States Constitution*. Trial counsel's failure to attack or adequately investigate the appellant's capacity to waive her Miranda rights prior to her confession was not a result of conflicting potential strategies or tactics. Furthermore, his failure to investigate and adequately attack the confession was not harmless error—the State relied heavily on the confession in making its case against the appellant. Even the lawyer who testified as to the "normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law," on behalf of the State admitted that such an attorney should have investigated the appellant's capacity in order to attack the confession.[10]

---

9. Mr. Butcher did request an evaluation of the appellant to determine whether she suffered from "battered wife syndrome." The court acquiesced to this request and ordered such an evaluation one week before the trial. Mr. Butcher, however, neglected to have the appellant evaluated because he believed any evidence of "battered wife syndrome" would provide a motive for the appellant's conduct to support the State's case. We find this reasoning incomprehensible in light of the appellant's confession wherein she stated that she had been physically and verbally abused by her husband. With the confession admitted, evidence that the appellant had been abused by the victim could only have aided her case for mercy. As we stated in *State ex rel. Leach v. Hamilton*, — W.Va. —, —, 280 S.E.2d 62, 65 (1980): "We cannot envision a murder defense, however, that would not re-

quire introduction of all possible evidence toward reduction of a jury's view of the severity of defendant's acts. Even when alibi is a defense, good character evidence would be appropriate."

10. Habeas counsel for the appellant questioned Joseph Martorella, an assistant prosecuting attorney for Wayne County, to the effect of the following:

Q. If you had a report from a psychiatrist which said Brigitte Wickline was a borderline mentally retarded, I believe was the operative words, would you think that might be something you might want to explore in terms of developing that sort of evidence to either get to the court or to the jury in order for them to weight [sic] the confession?

We believe the evidence in this case conclusively shows that the appellant was denied effective assistance of counsel when counsel failed to investigate and adequately attack the admission of the appellant's confession based upon her lack of capacity to waive her Miranda rights. Therefore, the March 12, 1991 final order of the Circuit Court of Wayne County denying the appellant relief in habeas corpus is reversed, and this case is remanded for a new trial.

Reversed and remanded.

A. Well, yes, you would probably try that, but I don't know if the court would—I would not be very confident the court would throw it out based on that.